IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IRVING BELL, | ) | |
|     Plaintiff, | ) | Case No: 12 C 449 |
| | ) | |
| v. | ) | |
| | ) | Judge Ronald A. Guzmán |
| GREYHOUND LINES INC. and | ) | |
| AMALGAMATED TRANSIT UNION, | ) | |
| LOCAL 1700, | ) | |
|     Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Irving Bell, a former bus driver with Greyhound Lines, Inc. ("Greyhound"), brought suit against Greyhound and Amalgamated Transit Union, Local 1700 ("the Union"). As to Greyhound, Bell alleged race discrimination, retaliation, intentional infliction of emotional distress, defamation, and a hybrid claim under § 301 of the Labor Relations Management Act ("LMRA") As to the Union, Bell alleged the hybrid claim under the LMRA and intentional infliction of emotional distress. Both Greyhound and the Union move for summary judgment as to all claims against them. For the reasons stated herein, the motions are granted.

**I.     Summary Judgment Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining whether factual issues exist, the Court must view all the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Weber v. Univ. Research Assoc., Inc.*, 621 F.3d 589, 592 (7th Cir. 2010). The Court does not "judge the credibility of the witnesses, evaluate the weight of the evidence, or determine the truth of the matter. The only question is whether there is a genuine issue of fact." *Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Sarver v. Experian Info. Solutions*, 390 F.3d 969, 970 (7th Cir. 2004) (citations omitted).

**II.     Local Rule 56.1**

Greyhound and the Union served on Bell a "Notice to Pro Se Litigant Opposing Motion for Summary Judgment" as required by Local Rule 56.2. (Dkt. ## 108, 113.) The notice explained in detail the requirements of the Local Rules governing summary judgment.

Local Rule 56.1(b) requires a party opposing a motion for summary judgment to file:

>    (3) a concise response to the movant's statement that shall contain:
>
>>    (A) numbered paragraphs, each corresponding to and stating a concise summary of the paragraph to which it is directed, and
>>    (B) a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon, and
>>    (C) a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon. . . .

Local Rule 56.1(b)(3) (N.D. Ill.)

Despite being given a 30-day extension on the initial briefing schedule set by the Court, Bell failed to file a response to either Greyhound's or the Union's motions for summary judgment or their statements of fact. The Court may rigorously enforce compliance with Local Rule 56.1. *Stevo v. Frasor*, 662 F.3d 880, 886-87 (7th Cir. 2011) ("Because of the high volume of summary judgment motions and the benefits of clear presentation of relevant evidence and law, we have repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings."). Although *pro se* plaintiffs are granted some leniency in how their filings are construed, compliance with procedural rules is required. *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006). "[A] district court is entitled to decide the motion based on the factual record outlined in the Local Rule 56.1 statements." *Koszola v. Bd. of Educ. of City of Chi.*, 385 F.3d 1104, 1109 (7th Cir. 2004) (citations and internal quotation marks omitted).

Bell's failure to respond to the defendants' statements of facts means that those facts are deemed admitted provided they are supported by the record. *See* Local Rule 56.1(b)(3)(C) (N.D. Ill.) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party.")

## III.   Facts

*Greyhound Rules and Forms*

Greyhound maintains a document entitled the Driver's Rule Book. (Greyhound Stmt. Facts, Dkt. # 111, ¶ 2.) Greyhound Rule S-1-6 requires bus drivers to have an adequate supply of C-4s (witness statement report forms) and these C-4s must be filled out by each passenger on the bus in case of an accident. (*Id.*) Greyhound Rule S-1-8 requires bus drivers to complete and submit a C-2 (accident report form) to the company supervisor within 24 hours after an accident. (*Id.*) Greyhound Rule S-2 states "[i]t is the responsibility of the professional Greyhound driver to drive in such a manner as to identify accident-producing situations soon enough to take

2

reasonable and prudent action to avoid an accident." (*Id*. ¶ 3.) Greyhound Rule S-21 states that "[d]rivers have full responsibility to avoid contact with a fixed object." (*Id*.)

Greyhound has a written policy that defines a "preventable accident" as "[a]n accident where the driver could have but failed to properly identify an accident-producing situation soon enough to take reasonable and prudent action to avoid a collision." (*Id.* ¶ 4.) Greyhound also has a written policy that states: "The key factor in determining whether an accident is preventable hinges solely on whether or not the accident could have been prevented or avoided by our driver, not who was primarily responsible or at fault." (*Id.*)

A Greyhound Form 6 is a disciplinary document that can double as a termination letter. (*Id*. ¶ 6.)

*Collective Bargaining Agreement*

A collective bargaining agreement ("CBA") was in effect between Greyhound and the Union from April 1, 2010 through March 31, 2013. (*Id*. ¶ 7.) The CBA provides that discharge grievances must be initially filed at Step 2 and that Greyhound must respond to the grievance within 15 days of receipt of the grievance. (*Id* ¶ 8.) The CBA provides that if the grievance is not resolved at Step 2, the Union may appeal the decision to Step 3 within 15 days of receipt of Greyhound's Step 2 response. (*Id.*) The CBA provides that a Step 3 conference is to be held within 15 days after receipt of the Union's appeal to Step 3, unless otherwise agreed to by the Union and Greyhound. (*Id.*) The CBA further provides that, within 15 days of the Step 3 conference, Greyhound must respond with a written decision to the appropriate Union vice-president/assistant business agent. (*Id.*) Greyhound must also forward a copy of its written decision to the grievant and the appropriate Union steward. (*Id*. ¶ 9.) There is no time frame for Greyhound to forward a copy of its written decision to the grievant and the appropriate Union steward. (*Id*.)

Bell's duties included conducting a pre-trip bus safety inspection "to make sure the bus was safe before using it," driving the bus and thereby "transporting passengers" and operating the bus safely. (*Id*. ¶ 10.) Bell worked as a bus driver throughout his entire employment with Greyhound. (*Id*.) Bell completed six weeks of training to learn to drive a bus before he began working as a Greyhound bus driver. (*Id*. ¶ 11.)

Bell received and reviewed Greyhound's Driver Rule Book on May 6, 2008, which was during his initial training. (*Id*. ¶ 12.) Bell received documents containing Greyhound policies each day he was present at the six-week training; however, Bell admitted that he often "[didn't] really read them," was "too tired to be reading all of this stuff" and many of these documents "wouldn't have been important to me because I never would have expected to get into any kind of accident in a bus." (*Id.*).

*Bell's Performance*

Greyhound hired Bell, an African-American male, as a bus driver in or around May 2008. (*Id*. ¶ 10.) An August 2, 2008 Form 6 regarding Bell indicates that on July 2, 2008 Bell violated the federal 10-hour limitation of on-duty performance. (*Id*. ¶ 15.) An August 27, 2008 Form 6 regarding Bell indicates that on August 20, 2008, Bell was "cited for driving 87 mph in a posted 65 mph zone." (*Id*.) Bell testified that he was cited for speeding on August 20, 2008 and was subsequently suspended by Greyhound for that infraction. (*Id*.) On January 15, 2009, Bell was operating a Greyhound bus and had an accident where he struck a car. (*Id*. ¶ 16.) The car was stationary at the moment Bell's Greyhound bus struck it, and Bell determined at the time of the accident that it could have been avoided. (*Id*.) This accident caused damage to the car and to the Greyhound bus Bell was operating. (*Id*.) Bell took a refresher course as a result of the January 2009 accident. (*Id*.)

A March 15, 2009 Form 6 regarding Bell indicates that on March 2, 2009, Bell violated the federal 15-hour limitation of on-duty performance. (*Id*. ¶ 17.) A June 6, 2009 Form 6 regarding Bell indicates that on June 3, 2009, Bell did not return a phone call and therefore did not report to work promptly. (*Id.*) An August 22, 2009 Form 6 regarding Bell indicates that on July 21, 2009, Bell violated the federal 15-hour limitation of on-duty performance. (*Id*.) An August 17, 2009 Form 6 regarding Bell indicates that on August 17, 2009, Bell was not available when called and therefore was not available for work. (*Id*. ¶ 18.) A February 20, 2010 Form 6 regarding Bell indicates that on January 14, 2010, Bell violated the federal 70-hour limitation of on-duty performance. (*Id*.)

A Safety Violations Record form is located in Bell's Personnel file and memorializes Bell's safety violations during his employment with Greyhound. (*Id*. ¶ 19.) The Safety Violations Record indicates Bell received a 10-hour log violation on June 24, 2008. (*Id*.) On April 22, 2010, Bell was operating a Greyhound bus and had an accident where he was struck by a vehicle after he overshot a pickup point and was reversing his bus in the middle of the road. (*Id*. ¶ 20.) Bell took a refresher course as a result of the April 2010 accident. (*Id*.) On June 23, 2010 Bell was operating a Greyhound bus and had an accident where he hit a stationary concrete pylon. (*Id.* ¶ 21.) Bell testified that this accident significantly damaged the bus and rendered it inoperable. (*Id*.) Bell took a refresher course as a result of the June 2010 accident. (*Id*.) Bell testified that during his employment with Greyhound, he made errors in his driving logbooks six or seven times and was required to take six or seven refresher courses on logging scheduling. (*Id*. ¶ 22.) Bell testified that during his employment with Greyhound, on three or four occasions he did not respond to a call to report to work. (*Id*.) Greyhound views all of the accidents in Bell's safety record as preventable accidents. (*Id*. ¶ 23.)

*April 26, 2011 Accident*

On April 26, 2011, Bell was operating a Greyhound bus on a "turnaround" route that started in New York City, traveled to Washington D.C., and then turned around and returned to New York City. (*Id*. ¶ 24.) Bell used another Greyhound employee as a parking guide when he was parking his bus at the New York City bus terminal because he could not judge the clearance between his bus and the other bus. (*Id*. ¶ 25.) Bell realized that he had misjudged the clearance

4

and hit the parked bus when the Greyhound employee serving as a parking guide alerted him that he had had an accident and thereby created an eight to twelve inch scratch on the bus he had been parking. (*Id*.) The April 26, 2011 accident constituted the fourth accident Bell had been involved in as a Greyhound bus driver. (*Id*.) The April 26, 2011 accident did not result in: the loss of human life; anyone receiving medical treatment; either bus incurring disabling damage; either bus being transported away from the scene by a tow truck or other vehicle; or Bell receiving a citation. (*Id*. ¶ 26.)

After the accident, Bell called Greyhound fleet (a call center located in Texas) to report the accident and allow Greyhound fleet to create an 11-point collision report. (*Id*. ¶ 27.) The 11-point collision report created by Greyhound fleet states that Bell did not collect any C-4 witness statement reports after the April 26, 2011 accident. (*Id*.) On April 28, 2011, Greyhound relieved Bell of duty pending the outcome of Greyhound's investigation into the April 26, 2011 accident. (*Id*.)

*Greyhound's Decision to Terminate Bell*

Jeannette Dixon, an Operations Supervisor for Greyhound, conducted an investigation into the April 26, 2011 accident. (*Id*. ¶¶ 13, 28.) Through her investigation, Dixon concluded that Bell violated Rule S-2 because he did not identify an accident-producing situation in such a manner as to take reasonable and prudent action to avoid the accident. (*Id*.) Stated another way, Dixon concluded that on April 26, 2011, Bell was involved in a preventable accident. (*Id*.) Dixon testified that using another Greyhound employee as a parking guide did not negate Bell's violation of Rule S-2 because Bell is "the professional driver" and "it's still [his] responsibility with the ground guides or not" because "[he's] the one in the driver's seat." (*Id*.)

Through her investigation, Dixon concluded that Bell violated Rule S-1-8 because she believed that Bell did not turn in a Form C-2 accident report within 24 hours of the April 26, 2011 accident. (*Id*. ¶ 29.) Dixon also concluded that Bell violated Rule S-1-6 because the 11-point collision report created by Greyhound fleet states that Bell did not collect any C-4 witness statement reports after the April 26, 2011 accident. (*Id*.) In addition, Dixon concluded that Bell should be charged with a collision because the 11-point collision report created by Greyhound fleet states that Bell's bus made contact with another bus, thereby creating a scratch on Bell's bus. (*Id*.)

At the conclusion of her investigation, Dixon compiled her findings into a Form 6 dated May 8, 2011 and provided the document to her supervisor for review. (*Id*. ¶ 30.) Thereafter, Dixon issued the May 8, 2011 Form 6 to Bell. (*Id*.) The May 8, 2011 Form 6 indicates that Bell violated Greyhound Rule S-1-6, violated Greyhound Rule S-1-8, and that his record had been charged with a collision. (*Id*. ¶ 33.) The May 8, 2011 Form 6 charged Bell with a preventable accident on April 26, 2011. (*Id*.) At the time Dixon issued the May 8, 2011 Form 6 to Bell, everything contained in the May 8, 2011 Form 6 was correct and accurate to the best of Dixon's knowledge and ability. (*Id.* ¶ 30.)

*Bell's Grievance*

On May 11, 2011, Bell received the May 8, 2011 Form 6 notifying him that Greyhound had terminated his employment. (*Id*. ¶ 31.) Bell testified that the first paragraph of the May 8, 2011 Form 6, which states, "[o]n the above date, time, and approximate location your bus made contact with the rear of bus 6365. While pulling your bus into bay 74 the right rear of your bus made contact with the rear of bus 6365 causing scratches on the rear of your bus," is accurate. (*Id*.)

The second paragraph of the May 8, 2011 Form 6 states in part: "You are found to be in violation of Greyhound Rule S-2[.]" (*Id*. ¶ 32.) Bell testified that it is his subjective belief that he did not violate Greyhound Rule S-2. (*Id*.).

On May 13, 2011, Bell submitted a grievance to the Union concerning his termination. (*Id*. ¶ 34.) Bell indicated in his grievance that he hit a parked bus on April 26, 2011, but claimed Greyhound falsely accused him of failing to submit a accident report within 24 hours, failing to carry Form C-4s, and discriminated against him by firing him based on the allegedly false charges. (*Id.*) On May 18, 2011, Greyhound submitted its response to the Union and denied Bell's May 13, 2011 grievance. (*Id*. ¶ 35.) The response to Bell's May 13, 2011 grievance stated in part: "Operator Bell was terminated not only due to his lack of carrying C4s, our investigation shows he was terminated due to his safety record. Based on the above information this grievance is respectfully denied." (*Id*.)

*Third Step Conference*

On May 26, 2011, Bell sent Bruce Hamilton, then-President of the Union, an electronic message requesting a third step conference. (*Id*. ¶¶ 14, 36.) That same day, Hamilton responded to Bell's request by informing Bell that the third step conference was being arranged. (*Id*. ¶ 36.) On May 26, 2011, Ronald Jordan, a Union Regional Vice-President, appealed Bell's grievance to the third step conference. (*Id*. ¶¶ 14, 37.) Frederick Melton, previously the Chicago City Manager for Greyhound, on behalf of Greyhound, and Jordan, on behalf of the Union, agreed to hold the third step conference on July 28, 2011, and thereby extend the third step conference beyond 15 days after receipt of the Union's appeal to Step 3. (*Id*. ¶¶ 13, 37.) On July 28, 2011, a third step conference was held regarding Bell's May 13, 2011 Grievance. (*Id*. ¶ 37.)

Prior to the third step conference, Melton conducted an investigation into Bell and the April 26, 2011 accident after he found out that he was going to be presiding over the third step conference. (*Id*. ¶ 38.) During this investigation, Melton reviewed Bell's record as a driver and any safety violations that had been charged to Bell's record. (*Id*.) Bell, Melton, Randy Jones, a Greyhound driver and Union steward, Thomas Pierre, a Greyhound employee, and Jordan (via phone) attended the third step conference. (*Id*. ¶ 39.) At the third step conference, the Union took the position that Bell should not be fired for the April 26, 2011 accident. (*Id*.) Bell testified that at the third step conference he stated that the May 8, 2011 Form 6 was inaccurate because "I did turn in an accident report[,]" "I showed Kevin Conroy [previously Greyhound's Chicago

6

City Manager] the C-4s[,]" and "I did use two backers." (*Id.* ¶¶ 13, 39.)

On August 1, 2011, Greyhound issued its third step written decision to the Union and denied Bell's Grievance. (*Id.* ¶ 40.) Bell received the third step written decision on September 14, 2011. (*Id.*) The third step written decision states in part:

> Operator Bell collided with a parked bus while pulling into a loading slip. This is his fourth chargeable collision since January 15, 2009. He also has several other safety related infractions charged to his record. During the third step conference the validity of the language about not having or colleting C-4 witness slips and failure to complete the [C-2] collision report within twenty-four hours was questioned by Operator Bell. The company has no problem with dropping that language from the Form 6 but the collision did occur and will remain charged to his record. This grievance is denied.

(*Id.* ¶ 41.)

As noted, Greyhound indicated it would drop the charges in the May 8, 2011 Form 6 that indicated Bell had violated Rules S-1-6 and S-1-8. (*Id.* ¶ 42.) Melton testified that "those two charges were irrelevant to [Bell's] termination, [because he was] discharged for a collision and [his] previous record." (*Id.*) Melton testified that Bell's safety record included numerous DOT violations with regard to the number of hours Bell had driven, violations for speeding, and a total of four preventable collisions. (*Id.*) Melton testified that he sent the third step written decision to the appropriate vice president or assistant business agent of the Union within fifteen days of the third step conference. (*Id.*)

*The Union's Decision Not to Proceed to Arbitration*

The Union's Executive Board has the authority to determine whether to take a grievance to arbitration and the Union is not required under the CBA to take a grievance to arbitration. (*Id.* ¶ 43.) On August 5, 2011, the Union's Executive Board voted to authorize Hamilton to further investigate Bell's grievance and to make the final decision whether or not to arbitrate it. (*Id.*) Hamilton conducted his investigation and determined not to arbitrate Bell's grievance because there was no way the Union could win at arbitration. (*Id.* ¶ 44.) Hamilton testified there was no chance the Union could prevail in arbitration because Bell's grievance involved an obviously chargeable accident, in which Bell admitted to hitting the other bus, and because of Bell's safety record and his status as a short-term employee. (*Id.*)

Even after determining not to take Bell's grievance to arbitration, Hamilton tried to settle the case by attempting to persuade Greyhound to put Bell back to work. (*Id.* ¶ 45.) Greyhound refused to do so because he was a driver with very low seniority and had multiple accidents and safety violations on his record. (*Id.*) In a letter dated September 23, 2011, President Hamilton informed Bell that the Union had been unable to settle his grievance and that the grievance had come to an end. (*Id.* ¶ 46.)

7

*Bell's Claims*

Bell alleges that he was discriminated against when Ortega, a supervisor at Greyhound, allegedly concluded that Bell had failed a driver refresher course, and when Bell complained about "pay" or "why I was taken off that charter," Ortega allegedly told Bell "if I don't like it, I could quit." (*Id.* ¶ 55.) Bell testified that Ortega's alleged actions constituted racial discrimination because "What other reason would he have? I didn't do anything to him." (*Id.* ¶ 56.) Bell also alleges that he was discriminated against when Melton purportedly lied, altered documents and did not adhere to the CBA during the grievance process. (*Id.* ¶ 57.) Bell testified that Melton's alleged actions constituted racial discrimination because "I didn't know him" and because "several people" who Bell "can't remember" told Bell "rumors" that Melton is racist. (*Id.*) Bell testified that it is "kind of hard to believe" that Melton was "doing this for racial reasons" but that Melton "might be racist" and he just had a feeling that maybe Melton was motivated by race. (*Id.* ¶ 58.) Bell testified that maybe Melton had a racist attitude, but he "can't swear to it" and did not "know for a fact." (*Id.*)

Bell also alleges that he was discriminated against because Greyhound withheld documents. (*Id.* ¶ 59.) Bell testified that he does not personally know who allegedly withheld documents. (*Id.*) Bell further testified that someone allegedly withholding documents constituted racial discrimination because "they had to have known . . . that there was other things I could go for in trying to have this redressed rather than just this grievance process if not fairly adjudicated, right?" (*Id.*)

Bell alleges that Greyhound retaliated against him by terminating his employment and by implementing a grievance process that was "contrived so unfairly to me." (*Id.* ¶ 60.) Bell alleges that Greyhound retaliated against him in part due to his "standing up for my right to be paid what I worked" roughly one year before his termination. (*Id.*) More specifically, Bell alleges that his termination and the grievance process was retaliation for getting into an argument with Ortega regarding Bell receiving proper payment for the hours he had worked. (*Id.*)

Bell testified that his termination constituted retaliation for the incident with Ortega "because I kept hearing people talking about it around the country" and they "were saying things, like 'Oh, you're the one, you're the Bell who got into it with Karl Ortega. You know, he's a powerful man.'" (*Id.* ¶ 61.) Bell also alleges that his termination was retaliation due to Bell previously filing the following three grievances: (a) a 2009 grievance that Bell cannot specifically remember, but he thinks alleged a pay shortage; (b) an October 2010 grievance alleging that he was not paid for a layover; and (c) a 2010 grievance alleging that Bell was improperly taken off a particular assignment. (*Id.* ¶ 62.) Bell testified that his termination constituted retaliation for the three grievances because "[t]here's no reason for him [Melton] to have done the things that he did in keeping me terminated other than either retaliation, racial animus, or both that I can come up with logically." (*Id.*)

Bell testified that the grievance process constituted retaliation because "I don't know for a fact. But I cannot come up with a reason why they [Greyhound and the Union] would act that

way." (*Id.* ¶ 63.) Bell alleges that Greyhound breached the CBA with the Union by using false charges to terminate him rather than just cause and by discriminating against Bell and thereby allegedly violating CBA Article G-22. (*Id.* ¶ 64.) Bell alleges that the Union breached its duty of fair representation because it decided not to pursue arbitration on Bell's behalf. (*Id.* ¶ 65.) Bell alleges that the Union acted arbitrarily, but he "do[es not] know" why he believes as much. (*Id.*)
Bell further alleges that the Union took discriminatory actions because they allegedly treated him differently. (*Id.* ¶ 66.) Bell does not believe that the Union discriminated against him on account of his race. (*Id.*) Bell alleges that the Union acted in bad faith because the decisions the Union made "weren't the correct actions[.]" (*Id.* ¶ 67.)

*Intentional Infliction of Emotional Distress*

Bell alleges that Greyhound committed intentional infliction of emotional distress because of the "conglomeration" of allegedly using false charges to terminate him and breaching the CBA. (*Id.* ¶ 68.) Bell testified that he does not believe Greyhound intended that its purported conduct would inflict emotional distress on Bell. (*Id.*)

*Defamation*

Bell alleges that Greyhound made the following false statements: (a) that Bell did not turn in a Form C-2 after the April 26, 2011 accident (b) that Bell was not carrying an adequate number of Form C-4s after the April 26, 2011 accident; (c) that the April 26, 2011 accident demonstrated Bell violated Greyhound Rule S-2; and (d) that the April 26, 2011 accident constituted a "collision." (*Id.* ¶ 69.) Bell alleges Greyhound published the alleged false statements within Greyhound and to the Union. (*Id.* ¶ 70.) Bell alleges that the publication of the alleged false statements damaged him because it resulted in his termination and "I can't seem to get rid of the nightmares." (*Id.*) Bell testified that he believes that the alleged false statements made by Greyhound caused his termination because "the termination letter said so." (*Id.*)

## IV.     Analysis

### A.     Race Discrimination (against Greyhound)

Bell may attempt to prove his § 1981 race discrimination claim under the direct or indirect methods. *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir 2008).[1] Under the direct method, a plaintiff must produce either direct or circumstantial evidence of discrimination. *Mach v. Will Cnty. Sheriff*, 580 F.3d 495, 499 (7th Cir. 2009). Direct evidence usually "requires an admission of discriminatory animus," while circumstantial evidence "establishes an employer's

---

[1] While some caselaw cited by the Court may pertain to a discrimination case under Title VII, "the methods of proof and elements of [a Section 1981] case are essentially identical" to those in a Title VII case. *McGowan v. Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009).

9

discriminatory motive through a longer chain of inferences." *Id*. According to the Seventh Circuit,

> [c]ircumstantial evidence demonstrating intentional discrimination includes: "(1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination."

*Atanus*, 520 F.3d at 672 (quoting *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007)). Under the indirect method, a plaintiff must establish a prima facie case of discrimination with evidence that (1) he is a member of a protected class; (2) he met his employer's legitimate job expectations; (3) she suffered an adverse employment action; (4) similarly-situated employees outside of the protected class were treated more favorably. *Smiley v. Columbia Coll. Chi.*, 714 F.3d 998, 1002 (7th Cir. 2013). If the plaintiff has evidence that can meet those four criteria, the burden shifts to the employer to offer a non-discriminatory reason for the adverse employment action. *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012). If the employer does so, the burden shifts back to the plaintiff to present evidence that, if believed by the trier of fact, would show that the real explanation for the action is discrimination. *Id.*

Bell did not respond to Greyhound's motion for summary judgment and therefore has not indicated whether he is proceeding under the direct and/or indirect methods of proof. *Morgan v. SVT, LCC*, --- F.3d ---, 2013 WL 3944269, at *4 (7th Cir. Aug. 1, 2013) ("When a plaintiff is responding to an employer's motion for summary judgment, he (in this case) must initially identify whether he is litigating his case under a "direct" or an "indirect" method of proof (or both)."). Nevertheless, the record as reflected in Greyhound's statement of facts does not include any direct or circumstantial evidence of discrimination. As to the indirect method, no record evidence demonstrates that Bell was meeting Greyhound's legitimate job expectations or that similarly-situated employees who are not African American were treated more favorably.

Even assuming that Bell has met the requirements of a prima facie case for race discrimination, he cannot show pretext. Pretext "means a dishonest explanation, a lie rather than an oddity or an error." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir. 2008) (internal quotes omitted). "The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011). Greyhound contends that Bell was terminated for his April 2011 accident and other safety violations and the record does not provide any support for a finding of pretext with respect to these reasons.

For these reasons, the Court grants Greyhound's motion for summary judgment as to the race discrimination claim.

B.  Retaliation (against Greyhound)

Bell alleges retaliation under both § 1981 and Title VII. Specifically, Bell contends that he was terminated and not treated fairly during the grievance process for getting into an argument with Ortega about his pay and for his having filed three grievances as to his wages and work assignments. (Greyhound's Stmt. Fact, Dkt. # 111, ¶¶ 60-63.)

A plaintiff may establish a prima facie case of retaliation using either the direct or indirect methods. *Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012). To avoid summary judgment on his retaliation claim under the direct method, Bell must point to evidence from which a jury could conclude that "(1) [he] engaged in activity protected by Title VII; (2) the [defendant] took an adverse employment action against [him]; and (3) there was a causal connection between [his] protected activity and the adverse employment action." *Id.*; *see also Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 740 (7th Cir. 2011). Alternatively, he can survive summary judgment under the indirect burden-shifting method if he shows that he: (1) engaged in statutorily protected activity; (2) performed his job satisfactorily; (3) suffered an adverse employment action; and (4) was treated less favorably than other similarly situated employees who did not engage in protected activity. *Dear v. Shinseki*, 578 F.3d 605, 610-11 (7th Cir. 2009). If Bell sets forth a prima facie case of retaliation, Greyhound must then articulate a legitimate, nondiscriminatory reason for its decision to terminate him. *Vaughn v. Vilsack*, 715 F.3d 1001, 1006 (7th Cir. 2013). If it does so, Bell must then produce evidence supporting an inference that the proffered reason was pretextual. *Id*.

Bell cannot survive either method because he did not engage in statutorily protected activity. Complaints about his pay and work assignments, absent any connection to his race or other protected classification, do not constitute protected expression. *Kodl v. Bd. of Ed. Sch. Dist. 45, Villa Park*, 490 F.3d 558, 563 (7th Cir. 2007) ("To constitute protected expression, 'the complaint must indicate the discrimination occurred because of sex, race, national origin, or some other protected class.'") (citation omitted). Even assuming the complaints and grievances were protected expression, Bell has not demonstrated nor does the record reflect that his termination, which was based on his April 2011 accident and poor safety record, were in any way caused by his complaints regarding his pay or work assignments. Dixon conducted the investigation into his April 26, 2011 accident and concluded that Bell had not complied with certain of Greyhound's rules and regulations and terminated him. (Union Ex. #8, 5/8/11 Notice of Personnel Record Entry.) No record evidence establishes that Dixon was aware of any of the pay complaints or grievances. *Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004) ("The key inquiry in determining whether there is a causal connection under the direct method is whether [the decisionmaker] was aware of the allegations of discrimination at the time of her decisions to place [the plaintiff] on a PIP and terminate her employment; absent such knowledge, there can be no causal link between the two.")

11

Even assuming that Bell has established a prima facie case of retaliation, Bell points to no competent evidence that Greyhound's reason for terminating him was pretextual nor does the record reflect such evidence. Bell's speculation or reported rumors as to why he was terminated or how he was treated during the grievance process are insufficient to establish pretext. *Hall v. City of Chi.*, 713 F.3d 325, 333 (7th Cir. 2013); *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004) ("Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion.").

For these reasons, Greyhound's motion for summary judgment as to the retaliation claim is granted.

C. Hybrid Claim under § 301 of the LMRA (against Greyhound and the Union)[2]

Bell's suit against the Union for breach of the duty of fair representation and against Greyhound for breach of the CBA "is referred to as a hybrid suit because it is comprised of two causes of action that are inextricably interdependent." *McLeod v. Arrow Marine Transp., Inc.*, 258 F.3d 608, 613 (7th Cir. 2001) (internal quotation marks and citation omitted). "In a hybrid 301 suit, the employee's claim against the union and his claim against the employer are interlocked: neither claim is viable if the other fails." *Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1238, 1241 (7th Cir. 1997) (internal quotation marks and citation omitted).

As to the purported breach of duty of fair representation by the Union, Bell alleges that the Union failed to fairly represent him because it refused to address his contention that Greyhound made false accusations against him, did not take issue with Greyhound's purported breach of the CBA when it failed to issue a timely decision from its third step conference, allowed Greyhound to alter documents, and generally refused to address Bell's issues regarding the reasons for his firing.

In order for Bell to succeed on his breach of duty of fair representation claim against the Union, he must show that the Union's conduct toward him was "arbitrary, discriminatory, or in bad faith." *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 916 (7th Cir. 2013). A union has "wide latitude" in representing its members. *Id.* Bell states that he was not treated fairly by the Union because "Mr. Jordan[3] hat[es] my guts." (Greyhound Ex. A, Bell Dep. at 295.) Bell also testified

---

[2] Although Bell alleged a claim against Greyhound and the Union which he called "Intentional Breaches of Contract," in his response to the defendants' motions to dismiss, Bell indicated that the claim was actually a hybrid claim under § 301 of the LMRA. (Dkt. # 41-1, at 3.) Accordingly, the Court construes Bell's breach of contract claim and his claim against the Union alleging a breach of duty of fair representation together as constituting his hybrid claim under § 301 of the LMRA.

[3] Ronald Jordan was the Union's Regional Vice-President. (Union's Stmt. Facts, Dkt. # 107, ¶ 36.)

12

that the Union was "biased" because it "sided with Greyhound" and its actions were in bad faith because it did not take the "correct actions." (*Id*. at 295-96.) These conclusory and unsupported statements by Bell are insufficient to create a genuine issue of material fact with respect to the manner in which the Union dealt with his grievance. The record evidence establishes that Bell's grievance was taken through the appropriate process, Greyhound decided not to rehire Bell and Union President Hamilton, after investigation, elected not to take the grievance to arbitration after determining it would not be successful. Therefore, Greyhound's and the Union's summary judgment motions on the hybrid claim are granted.

    C.    Defamation (against Greyhound)[4]

Plaintiff alleges that Greyhound defamed him when it stated that he did not turn in an accident report, was not carrying an adequate number of C-4s, violated Rule S-2, and caused a collision. According to Bell, Greyhound published these statements in the Form 6, the notice of personnel action terminating him, within Greyhound and the Union, and, apparently, when the statements were discussed at his grievance proceedings.

"To prevail on a state law claim for defamation a plaintiff must show that: (1) the defendant made a false statement about the plaintiff, (2) there was an unprivileged publication of the defamatory statement to a third party by the defendant, and (3) the plaintiff has suffered damages." *Smock v. Nolan*, 361 F.3d 367, 372 (7th Cir. 2003).

Bell has not established that the above statements were false. Even assuming that Bell had pointed to record evidence creating a genuine issue of material fact with respect to the truth or falsity of these statements, the statements are subject to a qualified privilege. "A qualified privilege protects communications that would normally be defamatory and actionable, in order to effect the policy of protecting honest communication of misinformation in certain favored circumstances and thus facilitate the availability of correct information." *Pompa v. Swanson*, 990 N.E.2d 314, 321 (Ill. App. Ct. 2013) (citation and internal quotation marks omitted). "To determine if a qualified privilege exists, a court looks only to the occasion itself for the communication and determines as a matter of law and general policy whether the occasion created some recognized duty or interest to make the communication so as to make it privileged."
*Id*. (citation and quotation marks omitted).

The evidence establishes that Dixon made the comments in the Form 6 about Bell's failures in good faith and with the belief that they were true, she made the statements based on

---

[4] While an argument could be made that Bell's defamation claim is preempted by federal labor law, *see, e.g., Scott v. Machinists Auto. Trades Dist. Lodge No. 190 of N. Ca.*, 827 F.2d 589, 594 (9th Cir. 1987) ("Scott's defamation claim is also based on facts inextricably intertwined with the grievance machinery of the collective bargaining agreement"), Greyhound does not make this argument, thus, the Court does not address it.

her duty to investigate the April 2011 accident, and the statements were limited in scope, made on a proper occasion and published in a proper manner and to the proper parties in that no evidence suggests that the statements were published outside the Form 6 or the grievance proceedings, which were initiated by Bell. *Republic Tobacco Co. v. N. Atl. Trading Co., Inc.*, 381 F.3d 717, 727 (7th Cir. 2004) ("A statement is conditionally privileged when the defendant makes it (1) in good faith; (2) with an interest or duty to be upheld; (3) limited in scope to that purpose; (4) on a proper occasion; and (5) published in a proper manner only to proper parties.") (citing *Zeinfeld v. Hayes Freight Lines, Inc*., 243 N.E.2d 217, 221 (Ill. 1968)). Moreover, the statements on the Form 6 were conveyed to the Union because Bell filed a grievance regarding his termination. Because the statements were made as part of Greyhound's investigation into Bell's accident, and published as part of a union grievance initiated by Bell, they are subject to a qualified privilege. *See, e.,g., Farr v. St. Francis Hosp. and Health Ctrs.,* 570 F.3d 829, 834 (7th Cir. 2009) (finding statements in report by computer forensics company were privileged under Indiana law because "report was used during the grievance proceedings that [plaintiff] initiated and in response to a report [plaintiff] submitted"); *Coghlan v. Beck*, 984 N.E.2d 132, 146-47 (Ill. App. Ct. 2013) (statements made during corporate investigation into employee wrongdoing protected by qualified privilege); *Beauvoir v. Rush–Presbyterian St. Luke's Med. Ctr.*, 484 N.E.2d 841, 845 (1st Dist. 1985) (remarks made by supervisor regarding reasons for plaintiff's discharge were conditionally privileged). If a qualified privilege is established, the communication becomes actionable only if the privilege was abused. *Haywood v. Lucent Techs., Inc*., 169 F. Supp. 2d 890, 916 (N.D. Ill. 2001). Bell has not pointed to any evidence nor does the record establish that the privilege was abused here.

For these reasons, Bell's defamation claim fails and the Court grants Greyhound's motion with respect to this claim.

        D.       <u>Intentional Infliction of Emotional Distress (against Greyhound and the Union)</u>

Bell contends that Greyhound committed intentional infliction of emotional distress because of the "conglomeration" of allegedly using false charges to terminate him and breaching the CBA. (*Id*. ¶ 68.) Greyhound contends that Bell's intentional infliction of emotional distress claim is preempted by § 301 of the LMRA. When a state claim is "founded directly on rights created by a collective bargaining agreement[]" or "substantially dependent on analysis of a CBA," it is preempted by § 301 of the LMRA. *Atchley v. Heritage Cable Vision Assocs*., 101 F.3d 495, 498 (7th Cir. 1996). However, "only those state-law claims that require 'interpretation' of a CBA are inevitably federal." *Crosby v. Cooper B-Line, Inc*., --- F.3d ---, 2013 WL 4007928, at *4 (7th Cir. Aug. 7, 2013) (citation omitted). Here, Bell's claim revolves around his treatment by the Union and Greyhound with respect to his termination and grievance, but Greyhound has not shown that the allegations underlying the claim necessarily require interpretation of the CBA. Therefore, the Court concludes that the claim is not preempted.

In any event, the conduct alleged here does not rise to the level required for a successful intentional infliction of emotional distress claim. "Liability is triggered only when the defendant's conduct is so outrageous and extreme as to 'go beyond all possible bounds of

14

decency.'" *Myers v. Condos. of Edelweiss, Inc.*, No. 11 C 231, 2013 WL 4597973, at *7 (N.D. Ill. Aug. 29, 2013) (citation omitted). "Mere insults, indignities, threats, annoyances, petty oppressions or trivialities are insufficient." *Id.* (citations, alterations and internal quotation marks omitted). Bell's allegations as to how the Union and Greyhound dealt with his termination and grievance are insufficient to create a genuine issue of material fact with respect to this claim.

For these reasons, the defendants' motions for summary judgment as to this claim are granted.

## V. Conclusion

For the reasons stated herein, the defendants' motions for summary judgment [105, 109] are granted. Civil case terminated.

**Date**: September 13, 2013

_____
**United States District Judge
Ronald A. Guzmán**